Bruce L. Simon (96241; bsimon@cpsmlaw.com)
Barbara L. Lyons (173548; blyons@cpsmlaw.com)
Esther L. Klisura (221171; eklisura@cpsmlaw.com)
**COTCHETT, PITRE, SIMON & McCARTHY**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA  94010
Telephone:   (650) 697-6000
Fax Number: (650) 697-0577

*Attorneys for Plaintiff and the Putative Class*

E-filing

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

EDL

C 06 3358

| | |
|---|---|
| PATRICIA McALLISTER, a California resident, on behalf of herself and all others similarly situated, | Case No. |
| | **CLASS ACTION** |
| Plaintiff, | **COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT (15 U.S.C. § 1)** |
| vs. | **DEMAND FOR JURY TRIAL** |
| UNIVERSAL MUSIC GROUP, WARNER MUSIC GROUP CORP., TIME WARNER, INC., SONY BMG MUSIC ENTERTAINMENT, SONY CORPORATION OF AMERICA, BERTELSMANN, INC., and EMI GROUP PLC, | |
| Defendants. | |

LAW OFFICES
COTCHETT,
PITRE, SIMON &
McCARTHY

**COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT (15 U.S.C. § 1)**

**TABLE OF CONTENTS**

Pages

I. OVERVIEW OF THE ACTION ........................................ 1

II. JURISDICTION AND VENUE ....................................... 1

III. PARTIES ...................................................... 2

    A. Plaintiff ................................................ 2

    B. Defendants .............................................. 2

IV. CO-CONSPIRATORS AND AGENCY .............................. 5

V. BACKGROUND OF DOWNLOADED MUSIC ........................ 5

VI. NATURE OF THE ILLEGAL CONDUCT ............................ 7

VII. CLASS ACTION ALLEGATIONS ................................. 11

VIII. TRADE AND COMMERCE ...................................... 13

IX. ANTITRUST INJURY ........................................... 13

X. DAMAGES .................................................... 14

XI. FIRST CLAIM - VIOLATIONS OF 15 U.S.C. § 1 ...................... 15

XIII. PRAYER FOR RELIEF .......................................... 16

XIV. DEMAND FOR JURY TRIAL ..................................... 17

LAW OFFICES
COTCHETT,
PITRE, SIMON &
MCCARTHY

1       Plaintiff Patricia McAllister ("Plaintiff"), individually and on behalf of the Class

2  described below, brings this action for treble damages and injunctive relief under the

3  Sherman Antitrust Act of 1890 (15 U.S.C. § 1 *et seq.*) and Sections 4 and 16 of the

4  Clayton Antitrust Act of 1914 (15 U.S.C. §§ 15 and 26) against Defendants, demanding a

5  trial by jury.

6  **I.    OVERVIEW OF THE ACTION**

7       1.    Plaintiff brings this lawsuit as a class action on behalf of all individuals and

8  entities who have paid inflated prices for digitally formatted music that is transmitted and

9  downloaded through the Internet ("Downloaded Music"), that was produced,

10  manufactured, licensed, distributed and/or sold by Universal Music Group, Warner Music

11  Group Corp., Time Warner, Inc., Sony BMG Music Entertainment, Sony Corporation of

12  America, Bertelsmann, Inc., and/or EMI Group PLC ("Defendants"), their subsidiaries,

13  agents, or co-conspirators, during the period between 2001 and the present.

14       2.    Defendants, together with their co-conspirators, participated in a conspiracy

15  to fix or maintain the price of Downloaded Music. Because of Defendants' unlawful

16  conduct and conspiracy, Plaintiff and other members of the Class paid artificially inflated

17  prices for Downloaded Music. Plaintiff and other members of the Class purchased

18  Downloaded Music and have been damaged thereby.

19  **II.    JURISDICTION AND VENUE**

20       3.    Plaintiff brings this action pursuant to Sections 4 and 16 of the Clayton Act,

21  15 U.S.C. §§ 15 and 26, to recover treble damages and injunctive relief, and the costs of

22  suit, including reasonable attorneys' fees, against Defendants and their unnamed co-

23  conspirators for the injuries sustained by the Plaintiff and the members of the Class which

24  Plaintiff represents for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

25       4.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and

26  1337(a) and 15 U.S.C. §§ 15, 22 and 26.

27       5.    This Court has general and specific personal jurisdiction over each of the

28  named Defendants. Each of the Defendants was engaged in an illegal price-fixing

LAW OFFICES
COTCHETT,
PITRE, SIMON &
MCCARTHY

**COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT (15 U.S.C. § 1)**    1

1   scheme and conspiracy that was directed at, and/or caused injury to, persons and entities

2   residing, located or doing business in the United States, including, but not limited to,

3   California. At all relevant times, each of the Defendants marketed and sold Downloaded

4   Music to purchasers in the United States, including, but not limited to, California.

5       6.     Venue is properly laid in this district under 15 U.S.C. §§ 15, 22 and 26 and

6   28 U.S.C. § 1391 (b) and (c), because Defendants transact business, maintain offices, or

7   are otherwise found within this district, and many of Defendants' unlawful acts giving

8   rise to Plaintiff's claim occurred, and a substantial portion of the affected interstate trade

9   and commerce described below has been carried out, in this district.

10      7.     The business activities of Defendants and their co-conspirators which are at

11   issue in this Complaint were within the flow of, and substantially affected, interstate trade

12   and commerce.

13   **III.**   **PARTIES**

14      **A.**     **Plaintiff**

15      8.     Plaintiff Patricia McAllister ("Plaintiff") is a California resident, living in

16   the City of Altadena, County of Los Angeles.

17      9.     During the time period alleged in this Complaint, Plaintiff was injured and

18   suffered damages by reason of the antitrust violations alleged herein. Specifically,

19   Plaintiff purchased Downloaded Music during the class period and paid an artificially

20   inflated price as a result of Defendants' conduct.

21      **B.**     **Defendants**

22      10.     Defendant Universal Music Group ("UMG") is a Delaware corporation

23   with its headquarters in Universal City, California. Defendant UMG is a subsidiary of

24   Vivendi Universal S.A. ("Vivendi"), headquartered in Paris, France. Vivendi is a

25   conglomerate that, in addition to its music business, owns many of the leading media and

26   telecommunication companies in Europe and Africa and is also one of the world's largest

27   video game developers. UMG owns and controls music sold under such record labels as

28   Mercury, Interscope Geffen A&M, Geffen Records, Island Def Jam, Philips and Polydor

LAW OFFICES
COTCHETT,
PITRE, SIMON &
MCCARTHY

1   Records.  Defendant UMG produces, licenses and distributes Downloaded Music through
2   a wide variety of retailers, some of whom are owned and/or controlled by Defendant
3   UMG.

4      11.   Defendant Warner Music Group Corp. ("Warner") is a Delaware
5   corporation with its principal corporate headquarters located in New York City.  Warner
6   owns and controls music released under such record labels as Warner Bros., Asylum, Bad
7   Boy, Reprise, Sire, Atlantic, Elektra, and London Records.  Defendant Warner produces,
8   licenses and distributes Downloaded Music through a wide variety of retailers, some of
9   whom are owned and/or controlled by Defendant Warner or its corporate parent, Time
10  Warner, Inc.

11     12.   Defendant Time Warner, Inc. ("Time Warner") is the largest media
12  conglomerate in the world, with its headquarters in New York City.  In addition to
13  Warner Music Group Corp., it owns AOL, HBO, CNN, Court TV, TBS, TNT, the WB
14  Network, Turner Classic Movies, Cartoon Network, Time Warner Cable, Road Runner
15  Hi-Speed Internet, New Line Cinema, Warner Brothers Studios, Castle Rock
16  Entertainment, Warner Books, Time Life, Little Brown, Sports Illustrated, Fortune,
17  Money, People, Entertainment Weekly, Southern Living, Field & Stream, Golf Magazine,
18  DC Comics, CompuServe, Netscape, MapQuest, Warner Brothers Theme Parks, and the
19  Atlanta Braves.

20     13.   Defendant Sony Corporation of America ("Sony") is a New York
21  corporation with its principal place of business in New York and is the U.S. subsidiary of
22  Sony Corporation, which is based in Tokyo, Japan.  In addition to its music operations
23  and large electronics business, Sony also owns Sony Pictures Entertainment, Columbia
24  TriStar Pictures, and Sony Playstation.

25     14.   Defendant Bertelsmann, Inc. ("Bertelsmann") is a Delaware corporation
26  with its principal place of business in New York, and is the U.S. subsidiary of
27  Bertelsmann AG, whose headquarters is in Gütersloh, Germany.  Bertelsmann Music
28  Group ("BMG") is a division of Bertelsmann.  Bertelsmann AG also owns dozens of

1  radio and television stations in Europe and major book publishers including Random

2  House, Bantam-Dell, Crown, Fodor's, Ballantine, Doubleday, and Knopf, and the

3  Columbia House CD club.

4      15.    Defendant Sony BMG Music Entertainment ("Sony BMG") is a Delaware

5  general partnership, with its principal place of business in New York City and a corporate

6  office in Santa Monica, California. Defendant Sony BMG was formed on August 5, 2004

7  as a joint venture of Defendant Sony and Defendant Bertelsmann to operate their merged

8  music operations. Defendants Sony and Bertelsmann merged their U.S. music operations

9  and purportedly transferred their respective music copyrights, licensing agreements and

10 royalty rights to Defendant Sony BMG, which is organized under the laws of New York.

11 Defendant Sony BMG maintains its principal headquarters in New York City. As a result

12 of its formation, Sony BMG now owns and controls music released under such record

13 labels as Arista, Columbia, Epic, and RCA Records. Defendant Sony BMG produces,

14 licenses and distributes Downloaded Music through a wide variety of retailers, some of

15 whom are owned and/or controlled by Defendant Sony BMG or their corporate parents,

16 Defendants Sony and Bertelsmann.

17     16.    Defendant EMI Group PLC ("EMI") is headquartered in London. EMI

18 operates in over 25 countries, and operates in the United States through wholly owned

19 subsidiaries including EMI Group North America, Inc., a Delaware corporation. At

20 various times, Defendant EMI has signed and released music from The Beatles, The

21 Beach Boys, The Byrds, The Hollies, and Pink Floyd. Defendant EMI owns and controls

22 music released under such record labels as Apple, Blue Note, Capitol, Chrysalis and

23 Virgin Records. Its largest United States operation is Capitol Records, a Delaware

24 corporation headquartered in Los Angeles. Its other major subsidiaries in the United

25 States are Astralwerks, Caroline Distribution, EMI Christian Music Group, EMI CMG

26 Distribution, EMI Gospel, EMI Latin, EMI Music Publishing Nashville and Virgin

27 Records. Defendant EMI produces, licenses and distributes Downloaded Music through a

28 variety of retailers at least one of whom is owned and/or controlled by Defendant EMI.

1   17.   Defendants, directly or through a division, parent, subsidiary or agent, have
2   had actual knowledge of, and have knowingly participated in, the conspiracy to fix the
3   prices for Downloaded Music, including the restraint of the availability and distribution
4   of said product.

5   18.   The acts charged in this Complaint to have been done by Defendants were
6   authorized, ordered and done by its officers, employees, agents, members or
7   representatives while actively engaged in the management, direction, control or
8   transaction of the business or affairs of each of the Defendants.

9   **IV.   CO-CONSPIRATORS AND AGENCY**

10   19.   Certain other persons, firms, corporations and entities have participated as
11   co-conspirators with Defendants in the violations and conspiracies alleged in this
12   Complaint.  In order to engage in the offenses charged and violations alleged herein,
13   these co-conspirators have performed acts and made statements in furtherance of the
14   antitrust violations and conspiracies alleged herein.

15   20.   At all relevant times, each Defendant was, and is, the agent of each of the
16   remaining Defendants, and in doing the acts alleged herein, was acting within the course
17   and scope of such agency.  Each Defendant ratified and/or authorized the wrongful acts of
18   each of the Defendants.  Defendants, and each of them, are individually sued as
19   participants and as aiders and abettors in the improper acts, plans, schemes, and
20   transactions that are the subject of this Complaint.  Defendants, and each of them, have
21   participated as members of the conspiracy or acted with or in furtherance of it, or aided or
22   assisted in carrying out its purposes alleged in this Complaint, and have performed acts
23   and made statements in furtherance of the violations and conspiracy.

24   **V.   BACKGROUND OF DOWNLOADED MUSIC**

25   21.   The technology to transmit and download music over the Internet has
26   existed for over a decade.  However, the distribution of music over the Internet did not
27   gain widespread popularity until the late 1990s when Napster, and similar music sharing
28   websites that allowed people to download music for free, emerged.  Thereafter, Napster's

LAW OFFICES
COTCHETT,
PITRE, SIMON &
MCCARTHY

1   music sharing service was found to violate copyright laws. After that important legal

2   ruling, Napster was forced to reinvent itself as a fee-based website that offers

3   Downloaded Music. At the same time, numerous other websites that offer Downloaded

4   Music for sale appeared in the marketplace, including Apple Computer's iTunes, a

5   popular music downloading service. The popularity of Downloaded Music has grown

6   exponentially in the last few years. For example, in 2005, 353 million single tracks were

7   downloaded in the United States, up from 143 million tracks in 2004.

8       22.    Defendants produce, license and distribute Downloaded Music to online

9   retailers for sale throughout the United States and in some instances sell it directly to

10  consumers through Internet sites. Defendants Bertelsmann, EMI, Sony and Time Warner

11  sell Downloaded Music directly to consumers through a joint venture called MusicNet.

12  Defendants Sony and UMG sell Downloaded Music directly to consumers through their

13  joint venture pressplay. Defendant Sony sells Downloaded Music directly to consumers

14  using its online store Sony Connect. Defendant Time Warner sells Downloaded Music to

15  consumers on its online store AOL Music Now. Defendants also sell their music to

16  Apple Computers for use on its music downloading site, iTunes.

17      23.    Through iTunes, Apple sells 80% of Downloaded Music in the United

18  States. In recognition of Apple's market power, and the fact that iTunes has 3 million

19  songs, Defendants undertook efforts to renegotiate their contracts with Apple, and to

20  cause Apple to change its pricing model. Defendants Warner and EMI both urged Apple

21  to offer variable pricing for iTunes based on how old the music was, and which content

22  was the hottest selling. Apple has resisted Defendants' pressure to use variable pricing,

23  and Apple's CEO Steve Jobs referred to this effort as greedy. Defendants' efforts are an

24  attempt to stifle competition and support the artificially high price generated by the

25  wrongful conduct, as alleged herein.

26      24.    Initially, Defendants tried to hold firm to their concerted decision not to

27  license their music catalogues to services that sell Downloaded Music to consumers. This

28  refusal to grant meaningful licenses to an entity which Defendants did not own or control

LAW OFFICES
COTCHETT,
PITRE, SIMON &
MCCARTHY

1   delayed and retarded the eventual growth of the subject market. Defendants sought to
2   forestall and then distort the development of the market because it would decrease
3   Defendants' CD sales and their considerable profit margins in CDs.

4       25.    During the summer of 2001, Defendants formed the subject joint ventures.
5   However, as alleged herein, these were not competition-oriented commercial ventures,
6   but rather attempts to occupy the market with frustrating and ineffectual services in order
7   to head off viable competitors from forming and gaining popularity after Napster's
8   demise. For instance, Defendants placed many onerous restrictions on the music files
9   once they were downloaded so as to make these sites difficult to use in hopes of
10  bolstering traditional music sales. However, when the Defendants realized that the
11  market for Downloaded Music could not be denied, they resorted to the anti-competitive
12  conduct alleged herein.

13  **VI.**    **NATURE OF THE ILLEGAL CONDUCT**

14      26.    Despite the magnitude of the harm caused, this is a relatively simple case of
15  collusion among Defendants to fix the price of Downloaded Music and manipulate the
16  market by which it is distributed. To carry out their scheme to manipulate the market for
17  Downloaded Music, some of the Defendants formed joint ventures. The MusicNet joint
18  venture, as alleged herein, was a collusive effort between Defendants EMI, BMG, and
19  Warner. Pressplay, formerly called Duet, was a collusive effort between Sony and UMG.

20      27.    Instead of using independent means to increase competition in the music
21  industry, these joint ventures served as a clearinghouse for the sharing of price
22  information and as a device to exchange information about each others' licensing
23  practices. The goal of these joint ventures was to set a floor on the price of Downloaded
24  Music, causing Downloaded Music to be more expensive to consumers than it would
25  have been without this collusion.

26      28.    Defendants imposed anti-competitive conditions upon Downloaded Music
27  services that licensed music through MusicNet. The pricing structure of the contract was
28  such that the licensee would have to pay penalties in the form of higher prices for

1  Defendants' music if the licensee licensed music from any company other than MusicNet.

2  This not only restrained trade in the Downloaded Music business, but also prevented the

3  small independent labels that competed with Defendants from obtaining access to online

4  outlets.

5       29.    Defendants were paid shares of the total revenues generated by a joint

6  venture licensee rather than receive money on a per song basis.  Because each

7  Defendants' financial interest in the joint ventures was therefore linked to the total sales

8  of all the labels rather than its own market share, Defendants had no incentive to compete

9  with one another.

10       30.    Edgar Bronfman, Jr., Executive Vice Chairman of Vivendi Universal and

11  the UMG executive in charge of his company's role in pressplay reportedly described

12  pressplay as follows:

13      Pressplay has what we call an affiliate model where **we determine the
   **price**, and we offer a percentage of that price to the retailing partner, in this
14  case either Microsoft of Yahoo or MP3.  The reason we've chosen that,
   frankly, is **because we are concerned that the continuing devaluation of
15  music will proceed unabated unless we do something about it**. If you
   allow an AOL or a RealNetworks or Microsoft or others, who have very
16  different business models, to use music to promote their own business
   model and simply pay the artists and the record companies the minimums,
17  they can advantage themselves on the back of the music industry in a way
   which continues to devalue music.

18

19  *See Napster's Copyright Abuse Defense*, Roger G. Noll (emphasis added).

20       31.    In addition to sharing information that violated the purported independence

21  of these joint ventures, Defendants masked their anti-competitive conduct by facially

22  trying to establish rules to prevent antitrust violations, ignoring them, and then using these

23  sham rules to convince the United States Department of Justice ("DOJ") to drop the

24  investigation it launched in 2001.  In "White Papers" presented to the DOJ, Defendants

25  claimed they had instituted firewalls, communication guidelines, safeguards, and other

26  supposed protections "to prevent exchanges of information, or other conduct, that could

27  negatively affect competition."  In other words, Defendants knew that the joint ventures

28

1  could be used to restrict competition, and fix the price of Downloaded Music in the

2  United States.

3      32.    On April 20, 2006, the Honorable Marilyn Hall Patel of this Court issued an

4  Order granting a motion to compel the production of privileged documents in *In Re*

5  *Napster, Inc. Copyright Litigation,* Case No. C MDL-00-1369 MHP.  In that Order, the

6  Court took the extraordinary step of adopting the crime fraud exception to the attorney-

7  client privilege, and made a number of findings were made that go to the heart of the

8  wrongful conduct alleged herein.  One such finding is that Defendants had a common

9  practice of using Most Favored Nation clauses ("MFNs") in their licenses that had the

10  effect of guaranteeing that the licensor would receive terms that were no less favorable

11  than the terms offered to other licensors.  Defendants argued that there could not have

12  been any collusion because the licenses granted by Defendants contain a "wide

13  dispersion" of terms.  With respect to this argument, the Court stated:

14           . . . it is not the presence of MFNs in particular agreements which
             undermines the truth of the disparate licensing representation, but rather the
15           consistent practice of including MFNs in all license agreements.  This
             practice–which UMG does not deny–is fundamentally incompatible with
16           UMG's assertion that the licences granted by the labels show a 'wide
             dispersion' of terms.  (Order at p.7, lines 10-14)
17

18      33.    The Court further stated that the disparate licensing argument is potentially

19  false in its entirety and is certainly highly misleading.  (*Id.*, p. 7 at lines 19-21)

20      34.    The Court carefully dissected the Defendants' assertions with regard to the

21  protections intended to keep licensing information from being shared amongst

22  competitors.  With regard to UMG, the Court read the "White Papers" as representing that

23  pressplay employees had more independence from UMG than even represented in the

24  guidelines, but then went on to cite numerous examples where the guidelines were

25  ineffective, ignored, and abused.  For example, the guidelines were specifically designed

26  to protect negotiations with third parties, yet pressplay hired a consultant to negotiate

27  these very types of deals after being debriefed by UMG executives.

28

35.   EMI's joint venture, MusicNet, made similar representations to the DOJ about the nature of the protections and the fact that there had been no violations. However, the Court again found compelling evidence that there were substantial breaches, including a "'side letter' agreement with EMI, separate from EMI's content license to MusicNet, which 'commits that EMI's core economic terms (price per song, % of revenue pool that goes to rightsholders, etc) will be no less favorable than BMG's and WMG's.'" Stunningly, the Court found that there was evidence that MusicNet's CEO decided to put the agreement in a side letter because of antitrust concerns. (*Id.* p. 11, lines 5-10)

36.   The anti-competitive efforts of Defendants, and each of them, both collectively and individually, were done with the intent of making sure that none of the Defendants were disadvantaged by real competition. The Defendants freely and intentionally colluded to establish a systematic method for assuring that there would be a floor on the price charged per song for licensing and distribution of Downloaded Music, and that each defendant would share in the illegal profits of this scheme. As a result of this collusion, Plaintiff and the Class paid more for Downloaded Music than they would have paid without this illegal conduct.

37.   Roger Noll, a well-respected economist and Professor at Stanford University, has characterized the Defendants' conduct as follows:

> The main findings and conclusions of this essay are as follows: First, the five distribution companies have created several joint ventures. The two most important joint ventures are MusicNet (BMG, EMI and Warner each owned 20 percent, and Real Networks the remaining 40 percent) and pressplay (owned by Sony and Universal), both of which engage in the wholesale and retail digital distribution of recorded music. Second, if public information about these two joint ventures is accurate, each will set wholesale prices for digitally distributed recordings that are controlled by their affiliated distribution companies, while pressplay also will set retail prices, so that **both ventures constitute horizontal price-fixing agreements.** Third, if information in the public record is accurate, **these five companies apparently have engaged in vertical foreclosure by refusing to enter into agreements on reasonable terms with other entities** for digital distribution of their library of recordings and by imposing unnecessarily burdensome licensing requirements on both retail competitors and their customers. Fourth, in the period immediately before and during the evolution of the policies of these companies regarding digital

LAW OFFICES
COTCHETT,
PITRE, SIMON &
MCCARTHY

distribution, **these five companies engaged in anticompetitive activities that have led to several adverse antitrust rulings by competition policy agencies in the United States and abroad**.

If the information in the public record that forms the basis of these conclusions is accurate, **the joint ventures for digital distribution of recorded music are anticompetitive horizontal combinations, and the vertical restraints imposed by the distribution companies also are anticompetitive**. The effects of these anticompetitive acts will be to reduce or even to eliminate the number of independent competitors in both wholesale and retail digital distribution, and thereby to harm consumers by raising prices and increasing price discrimination, and to harm artists by reducing competition for the right to distribute their recordings. Thus, the joint ventures and vertical foreclosure activities, if accurately reported, constitute misuse of the copyrights that are controlled by the distribution companies, their corporate affiliates, and other publishers.

*Napster's Copyright Abuse Defense*, Roger G. Noll (emphasis added).

## VII.   CLASS ACTION ALLEGATIONS

38.     Plaintiff brings this action both on behalf of herself, and as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), on behalf of the following Class (the "Class"):

> **All individuals and businesses who purchased Downloaded Music that was produced, manufactured, licensed, distributed and/or sold by Defendants between 2001 and the present. The class does not include: (1) Defendants; (2) Defendants' employees, including officers and directors; (3) Defendants' affiliates, subsidiaries, and co-conspirators; and (4) the Court to which this case is assigned.**

39.     Although Plaintiff does not know the exact number of Class members, since such information is the exclusive control of Defendants, Plaintiff believes that due to the nature of the trade and commerce involved Class members are sufficiently numerous, most likely hundreds of thousands of purchasers, and geographically dispersed throughout the United States such that joinder of all Class members is impracticable. The information as to the identity of the Class members can be readily determined from records maintained by Defendants and their agents.

40.     Plaintiff's claims are typical of the claims of the Class in that Plaintiff is a purchaser of Downloaded Music, all Class members were damaged in the same manner

1  by the same wrongful conduct of Defendants and their co-conspirators as alleged herein,

2  and the relief sought is common to the Class.

3     41.    Numerous questions of law and fact that are common to the Class arise

4  from Defendants' anticompetitive conduct. Among those common questions of law and

5  fact are:

6           a.    Whether Defendants engaged in a contract, combination or

7                 conspiracy among themselves and/or their co-conspirators to raise,

8                 fix, maintain, peg or stabilize the prices of Downloaded Music sold

9                 in the United States;

10          b.    The duration of the conspiracy and the nature and character of the

11                acts done in furtherance of the conspiracy;

12          c.    Whether the conspiracy violated Section 1 of the Sherman Act;

13          d.    Whether Defendants actively concealed the contract, combination or

14                conspiracy from Plaintiff and other Class members;

15          e.    Whether the conduct of Defendants and their co-conspirators caused

16                prices of Downloaded Music to be artificially inflated to non-

17                competitive levels; and

18          f.    Whether Plaintiff and other members of the Class were injured by

19                the conduct of Defendants and their co-conspirators and, if so, the

20                appropriate class-wide measure of damages and appropriate

21                injunctive relief.

22    42.    These common questions of law and fact are common to the Class, and

23  predominate over any other questions affecting only individual Class members.

24    43.    Plaintiff will fairly and adequately represent the interests of the Class in that

25  Plaintiff is a typical purchaser of Downloaded Music and has no conflicts with any other

26  member of the Class. Furthermore, Plaintiff has retained competent counsel experienced

27  in antitrust and class action litigation.

28

LAW OFFICES
COTCHETT,
PITRE, SIMON &
MCCARTHY

44. This class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy.

45. Prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for the Defendants.

46. Injunctive relief is appropriate as to the Class as a whole because Defendants have acted or refused to act on grounds generally applicable to the Class.

## VIII. TRADE AND COMMERCE

47. During the Class Period, Defendants and their co-conspirators made a substantial number of sales of Downloaded Music in a continuous and uninterrupted flow of interstate and international commerce to customers located in states and countries other than the states in which Defendants and their co-conspirators are located.

48. The business activities of Defendants and their co-conspirators that are the subject of this Complaint were within the flow of, and substantially affected, interstate and foreign trade and commerce.

49. Defendants concealed their collusive scheme by, among other things, entering into pretextual "safeguards," making misrepresentations to the DOJ, and using side agreements to document their MFNs. At all relevant times, Defendants held themselves out to the public as competitors, when in fact they had combined and were conspiring to raise prices. As a result of that concealment, Plaintiff and the Class were prevented from discovering the conspiracy until December, 2005.

## IX. ANTITRUST INJURY

The above alleged combination and conspiracy has had the following effects, among others:

    a. During the relevant period, price competition in the sale of Downloaded Music by Defendants and their co-conspirators has been unlawfully restrained, suppressed and/or eliminated throughout the United States;

LAW OFFICES
COTCHETT,
PITRE, SIMON &
MCCARTHY

b. During the relevant period, prices for Downloaded Music sold by Defendants and their co-conspirators have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

c. During the relevant period, purchasers of Downloaded Music from Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

50. As a direct and proximate result of the unlawful conduct of Defendants and their co-conspirators, Plaintiff and other members of the Class have been injured in their business and property in that they paid more for Downloaded Music than they otherwise would have paid in the absence of the unlawful conduct of Defendants and their co-conspirators.

51. Defendants have restrained trade in the subject market by engaging in price fixing. When defendants first entered the market with their joint ventures, they charged as little as $10 for 50 songs, or 20 cents per song. Defendants have effectively agreed to a wholesale price floor. By setting a wholesale price floor, Defendants have fixed and maintained the price of Downloaded Music at supracompetitive levels. Additionally, virtually all songs were licensed by the Defendants, who own labels, at the exact same price without regard to the artist, its popularity, its length or vintage. For example, Apple currently sells individual song downloads for 99 cents per song. By comparison, eMusic, a Downloaded Music service that serves the much smaller independent or "indie label" market, charges $10 for 40 songs, or 25 cents per song. Consumers, however, are not provided with any additional benefits for paying inflated prices for Downloaded Music.

## X.  DAMAGES

52. During the Class Period, Plaintiff and the other members of the Class purchased Downloaded Music from Defendants, or their subsidiaries, agents, and/or co-conspirators, and, by reason of the antitrust violations herein alleged, paid more for such products than they would have paid in the absence of such antitrust violations. As a

1  proximate result of Defendants' unlawful contract, combination or conspiracy, Plaintiff

2  and the other members of the Class have sustained damages to their businesses and

3  property in an amount to be determined at trial.

4  **XI.    FIRST CLAIM - VIOLATIONS OF 15 U.S.C. § 1**

5  53.    Plaintiff incorporates by reference all the above allegations as if fully set

6  forth herein.

7  54.    Beginning in at least 2001, the exact date being unknown to Plaintiff and

8  exclusively within the knowledge of Defendants, Defendants and their co-conspirators, by

9  and through their officers, directors, employees, agents, or other representatives, entered

10  into a continuing contract, combination or conspiracy to unreasonably restrain trade and

11  commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

12  55.    In particular, Defendants have combined and conspired to manipulate and

13  artificially inflate the price for Downloaded Music.

14  56.    Defendants, by their unlawful conspiracy, artificially raised, inflated and

15  maintained the market prices of said product as herein alleged.

16  57.    The contract, combination or conspiracy consisted of a continuing

17  agreement, understanding and concert of action among Defendants and their co-

18  conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the

19  prices of Downloaded Music they sold in the United States and elsewhere.

20  58.    For the purpose of formulating and effectuating their contract, combination

21  or conspiracy, Defendants and their co-conspirators did those things they contracted,

22  combined or conspired to do, including:

23              a.    Participating in meetings and conversations to discuss the prices of

24                    Downloaded Music;

25              b.    Agreeing to manipulate prices and supply Downloaded Music in a

26                    manner that deprived consumers of free and open competition; and

27              c.    Selling Downloaded Music to customers in the United States at non-

28                    competitive prices.

⊕
LAW OFFICES
COTCHETT,
PITRE, SIMON &
MCCARTHY

### XIII. **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.  A declaration that this action is a proper class action under Federal Rule of Civil Procedure 23(b)(3), on behalf of the Class as defined herein, and an Order directing that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to each member of the Class;

B.  A declaration that the unlawful combination and conspiracy alleged herein is an unreasonable restraint of trade of commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.  An injunction enjoining, preliminarily and permanently, Defendants from continuing the unlawful combination and conspiracy alleged herein;

D.  An award of damages to Plaintiff and each member of the Class, as provided by law, and joint and several judgments in favor of Plaintiff and each member of the Class against Defendants, and each of them, in an amount to be trebled in accordance with the antitrust laws;

E.  An award to Plaintiff and the Class for the costs of this suit (including expert fees), and reasonable attorneys' fees, as provided by law; and

F.  An award for such other and further relief as the nature of this case may require or as this Court deems just, equitable and proper.

DATED: May 22, 2006                    **COTCHETT, PITRE, SIMON & McCARTHY**

By: _____
    Bruce L. Simon
    *Attorneys for Plaintiff Patricia McAllister*
    *and the Putative Class*

LAW OFFICES
COTCHETT,
PITRE, SIMON &
McCARTHY

1  **XIV.  DEMAND FOR JURY TRIAL**

2      Plaintiff hereby demands a trial by jury on all issues triable by a jury.

3

4  DATED: May 22, 2006            **COTCHETT, PITRE, SIMON & McCARTHY**

5

6                                By: _____
                                        Bruce L. Simon
7                                   *Attorneys for Plaintiff Patricia McAllister*
                                    *and the Putative Class*
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT (15 U.S.C. § 1)**      17